NOTICE

Decision filed 02/14/23. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2023 IL App (5th) 210377

NO. 5-21-0377

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| ARCHFORD CAPITAL STRATEGIES, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 21-MR-89 |
| | ) | |
| WILLIAM P. DAVIS, | ) | Honorable |
| | ) | William D. Stiehl, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court, with opinion.
Presiding Justice Boie concurred in the judgment and opinion.
Justice Moore dissented, with opinion.

**OPINION**

¶ 1     This appeal arises out of a lawsuit filed by plaintiff, Archford Capital Strategies, LLC (Archford), against defendant, William P. Davis, seeking a declaratory judgment that the protocol for broker recruiting (Protocol) (did not invalidate the terms of an employment agreement entered into by Archford and Davis and seeking a judgment for money damages against Davis for breach of the employment agreement. Davis filed a motion to dismiss the complaint with prejudice pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2020)), which the circuit court of St. Clair County granted.

1

¶ 2        Archford appeals, arguing that the circuit court erred by granting Davis's motion to dismiss with prejudice. For the following reasons, we reverse and remand for further proceedings consistent with this opinion.

¶ 3                                    I. BACKGROUND

¶ 4        On April 7, 2021, Archford filed a two-count complaint against Davis, seeking a declaratory judgment (count I) and monetary damages for breach of contract (count II). Archford's complaint included the following factual allegations. Archford[1] provided investment advisory services, including financial planning and asset management for individuals, businesses, and institutions. Archford purchased another broker/dealer, Deschaine & Company (Deschaine), in 2015 and hired some of Deschaine's employees, including Davis. Archford entered into an employment agreement (Agreement) with Davis on August 24, 2015. Davis and James Maher, chief executive officer of Archford, signed the Agreement. Maher and Davis executed an addendum[2] to the Agreement on August 25, 2015. Maher and Davis executed the first amendment to the Agreement (Amendment) on September 15, 2019. Davis's employment with Archford terminated on October 22, 2020, and Davis became employed by Private Advisor Group on November 20, 2020. Archford alleged that several of its clients transferred to Davis following the termination of his employment with Archford and that Davis failed to comply with requirements regarding the transfer of clients set forth in the Amendment.

¶ 5        Archford attached copies of the Agreement, Amendment, and an affidavit prepared by Maher to the complaint.

¶ 6        The Agreement is 11 pages in length. The following provisions are relevant to this appeal:

_____

[1]Archford alleged that it was a Delaware limited liability company authorized to do business in Illinois and Missouri.
[2]The addendum to the Agreement does not contain any provisions relevant to this appeal.

"Archford, as an express condition precedent to employing Davis requires that Davis execute this agreement wherein Davis expressly covenants and agrees to maintain the confidentiality of the confidential and proprietary information and not to engage in conduct competitive to Archford.

* * *

1. *Employment*: Effective September 1, 2015, Archford agrees to employ Davis as a Relationship and Portfolio Manager with responsibilities of overseeing the strategic direction of Archford's Business and providing services to Archford's clients and performing such other duties as Archford may from time to time direct.

* * *

4. *Base Compensation*: Archford agrees to pay Davis a salary of Sixty Five Thousand Dollars ($65,000.00) per year. If the annual annuitized revenue from Fee Based Assets Under Management of the former Deschaine & Company, LLC clients measured on August 31, 2017, is greater than or equal to 120% of the annual annuitized revenue from Fee Based Assets Under Management of the Deschaine & Company, LLC client measured on August 31, 2015, Archford agrees to increase Davis'[s] base compensation to a salary of Seventy Five Thousand ($75,000.00) per year.

5. *Bonus Compensation*: In addition to his base compensation, Davis may be eligible to receive the following bonuses as set forth in this paragraph. The bonuses are based on the retention and growth of the Fee Based Assets Under Management of Deschaine & Company, LLC on the measurement date of August 31, 2015.

* * *

3

21. *Attorneys' Fees*: In the event a dispute regarding, arising out of, or in connection with the breach, enforcement, or interpretation of this Agreement, including, without limitation, any action seeking declaratory relief, equitable relief, injunctive relief, or damages, or any litigation or cause of action, including, without limitation, any appeals, federal bankruptcy proceedings, receivership or insolvency proceedings, reorganization, or other proceedings, the prevailing party shall be entitled to recover from the other their reasonable attorneys' fees and court costs, incurred in connection therewith, including appeals, as determined by the Court in such action or suit."

The provisions relevant to this appeal contained in the Amendment are as follows:

"*Recitals*

A. Archford and Davis entered into an Employment Agreement dated August 24, 2015 (the 'Agreement'), pursuant to which Archford agreed to employ Davis as a Relationship and Portfolio Manager.

B. Archford and Davis desire to amend the Agreement, as hereinafter provided.

\* \* \*

1. Paragraph 1 of the Agreement is amended to read as follows:

*Employment*: Davis is employed by Archford as a Relationship Manager with responsibilities of managing Archford's relationships with clients assigned to Davis from time to time and providing services to Archford's clients and providing such other services and performing such other duties as Archford may from time to time direct.

4

2. Paragraph 5 of the Agreement is amended to read as follows:

*Bonus Compensation*: Effective January 1, 2019, Davis shall receive bonus compensation pursuant to the Archford Relationship Management Compensation Plan as amended from time to time. The Archford Relationship Management Compensation Plan effective January 1, 2019, is attached hereto and incorporated herein by reference.[3]

3. The following Paragraph is added to the Agreement:

*Compensation to Archford for Transferred Clients*: Davis acknowledges that Archford shall be entitled to compensation for its work and investment in clients or referral sources that may transfer to Davis within twenty-four (24) months following any termination of his employment with Archford. Davis shall immediately report to Archford any revenue received by or on behalf of Davis (or any person or entity which employs or is otherwise associated with Davis) on account of any clients who transfer from Archford to Davis (or any entity which employs or is otherwise associated with Davis) following termination of Davis's employment with Archford. The amount due from Davis to Archford is for its work and investment in clients or referral sources that transfer shall be deemed conclusively to be eighty percent (80%) of the gross revenue earned in the first year following termination of employment starting with the first full quarter after termination or eighty percent (80%) of the gross revenue earned in the last year prior to termination of employment, whichever is greater, sixty percent (60%) of

---

[3]The "Archford Relationship Management Compensation Plan," effective January 1, 2019, was not included as part of Exhibit 2 to the complaint.

5

the gross revenue earned in the second year following termination or sixty percent (60%) of the gross revenue earned in the last year prior to termination of employment, whichever is greater, and forty percent (40%) of the gross revenue earned in the third year following termination or forty percent (40%) of the gross revenue earned in the last year prior to termination of employment, whichever is greater. The compensation paid to Archford shall be deemed to be a purchase of this 'book of business' from Archford. Payment due to Archford shall be due and payable at the earlier of when revenue is received by Davis (or any person or entity which employs or is otherwise associated with Davis) or on the 5th day of each quarter starting with the first quarter following the transfer of a client. All payments to Archford shall be accompanied by an accurate written report showing how the payment was computed and a true and correct copy of the total revenue earned during the relevant years including entire monthly statements showing advisory fees paid.

Notwithstanding anything herein to the contrary, no payment shall be due from Davis for any clients listed on Exhibit A and Exhibit B of the Agreement should they transfer to Davis after any separation from Archford.

4. Except as otherwise expressly provided herein, all of the terms, covenants agreements and other provisions of the Agreement shall remain in full force and effect and are hereby reaffirmed."

¶ 7    In support of count I, Archford alleged that there was an actual controversy between Archford and Davis as to Davis's obligations under paragraph 3 of the Amendment regarding the transfer of clients to Davis. Contrary to Davis's position that he was under no obligation to comply

6

with the paragraph 3 based on the Protocol, Archford alleged that the Protocol limited liability arising "by reason of" the taking of client information or solicitation of former clients and did not undo contractual obligations arising by reason of the transfer of clients. Archford claimed that it was not "attempting to prevent the taking of information or Davis's solicitation of his former clients." As such, Archford asserted that the Protocol did not bar enforcement of paragraph 3 of the Amendment and Davis was obligated to comply. Accordingly, Archford requested that the circuit court enter an order (1) declaring that the Protocol did not render unenforceable or otherwise invalidate any of Davis's obligations under paragraph 3 of the Amendment, (2) declaring that Davis was required to immediately comply with any past-due and future obligations under paragraph 3 of the Amendment, (3) awarding Archford reasonable attorney fees and court costs, and (4) granting any other such relief the court deemed proper.

¶ 8     In count II, Archford alleged that the Agreement and Amendment were valid and enforceable contracts supported by consideration. Archford alleged that it performed its obligations under the contract and that Davis breached his obligations under paragraph 3 by failing to pay Archford compensation in connection with the transfer of certain clients to Davis. Archford further alleged that it was damaged by Davis's breach in that it had not received the compensation owed under the Amendment. Accordingly, Archford requested that the circuit court enter an order (1) awarding Archford compensatory damages for all past-due obligations in an amount established following a trial, (2) requiring Davis to perform all past-due obligations under paragraph 3, (3) awarding Archford reasonable attorney fees and court costs, (4) awarding Archford pre- and post-judgment interest as permitted by law, and (5) granting any other relief the court deemed proper.

7

¶ 9    On May 26, 2021, Davis filed a motion to dismiss pursuant to section 2-619(a)(9) of the Code, arguing that the Protocol applied and defeated Archford's claims. Davis asserted that the Protocol explicitly stated that registered representatives, such as Davis, have no monetary or other liability to their former firms if they comply with the terms of the Protocol. In addition to asserting that he complied with the terms of the Protocol, Davis claimed that the Protocol applied because both Archford and his new firm were signatories to the Protocol. Davis attached to his motion a copy of the Protocol, which provided, in pertinent part, as follows:

> "The principal goal of the following protocol is to further clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ('RRs') between firms. If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for 'raiding.' The signatories to this protocol agree to implement and adhere to it in good faith.
>
> When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ('the Client Information') and are prohibited from taking any other documents or information. Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her. The RR list delivered to the branch also shall include the account numbers for the clients

serviced by the RR. The local branch management will send the information to the firm's back office. In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken by him or her.

* * *

RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm.

* * *

Accounts subject to a services agreement for stock benefits management services between the firm and the company sponsoring the stock benefit plan that the account holder participates in (such as with stock option programs) would still be subject to (a) the provisions of that agreement as well as to (b) the provisions of any account servicing agreement between the RR and the firm. Also, accounts subject to a participation agreement in connection with prospecting IRA rollover business would still be subject to the provisions of that agreement.

If an RR is a member of a team or partnership, and where the entire team/partnership does not move together to another firm, the terms of the team/partnership agreement will govern for which clients the departing team members or partners may take

9

Client Information and which clients the departing team members or partners can solicit. In no event, however, shall a team/partnership agreement be construed or enforced to preclude an RR from taking the Client Information for those clients whom he or she introduced to the team or partnership or from soliciting such clients[.]

In the absence of a team or partnership written agreement on this point, the following terms shall govern where the entire team is not moving: (1) If the departing team member or partner has been a member of the team or partnership in a producing capacity for four years or more, the departing team member or partner may take the Client Information for all clients serviced by the team or partnership and may solicit those clients to move their accounts to the new firm without fear of litigation from the RR's former firm with respect to such information and solicitations; (2) If the departing team member or partner has been a member of the team or partnership in a producing capacity for less than four years, the departing team member or partner will be free from litigation from the RR's former firm with respect to client solicitations and the Client Information only for those clients that he or she introduced to the team or partnership.

\*\*\*

A signatory to this protocol may withdraw from the protocol at any time and shall endeavor to provide 10 days' prior written notice of its withdrawal to all other signatories hereto. A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory. The protocol will remain in full force and effect with respect to those signatories who have not withdrawn." (Emphasis omitted.)

¶ 10    On October 19, 2021, following a hearing,[4] the circuit court entered an order granting Davis's motion to dismiss with prejudice. The court found that the Protocol barred enforcement of the Agreement. Additionally, the court found that Davis was entitled to recover his reasonable attorney fees and court costs from Archford. Archford filed a timely notice of appeal on November 18, 2021.

¶ 11                                II. ANAYLSIS

¶ 12    On appeal, Archford challenges the circuit court's order granting Davis's motion to dismiss its complaint with prejudice pursuant to section 2-619(a)(9). Archford contends that the court erred by dismissing the complaint where Davis failed to show that Archford's claims were barred by an affirmative matter. We agree.

¶ 13    "A motion to dismiss under section 2-619(a)(9) admits the legal sufficiency of the plaintiff's complaint but asserts that the claim against the defendant is barred by an affirmative matter that avoids the legal effect of or defeats the claim." *Kuykendall v. Schneidewind*, 2017 IL App (5th) 160013, ¶ 32 (citing 735 ILCS 5/2-619(a)(9) (West 2014), and *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55). "An 'affirmative matter' is a type of defense that negates a cause of action completely or refutes critical conclusions of law or conclusions of material fact that are unsupported by specific factual allegations contained in or inferred from the complaint." *Id.* ¶ 32 (citing *Smith v. Waukegan Park District*, 231 Ill. 2d 111, 121 (2008), and *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 115 (1993)). The "affirmative matter" must be either apparent on the face of the complaint or supported by affidavits or other evidentiary materials and must do more than refute a well-pleaded fact in the complaint. *Id.* (citing *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370, 383 (1997)). "Section 2-619(a)(9) does not authorize the defendant

---

[4]A transcript of the hearing was not included in the record on appeal.

to submit affidavits or evidentiary matters for the purposes of contesting the plaintiff's factual allegations and presenting its version of the facts." *Id.* (citing *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 34). "The defendant has the initial burden of establishing that an affirmative matter defeats the plaintiff's claim, and if satisfied, the burden shifts to the plaintiff to demonstrate that the proffered affirmative matter is either unfounded or requires the resolution of a material fact." *Id.* (citing *Epstein*, 178 Ill. 2d at 383, and *Hodge*, 156 Ill. 2d at 116).

¶ 14    When ruling on a section 2-619(a)(9) motion to dismiss, a circuit court must accept as true all well-pleaded facts in the complaint and all reasonable inferences that may be drawn, and the court must construe the pleadings and supporting documents in a light most favorable to the nonmoving party. *Id.* ¶ 33 (citing *Sandholm*, 2012 IL 111443, ¶ 55). The court should grant the motion only if the plaintiff can prove no set of facts that would support his cause of action. *Id.* (citing *In re Estate of Boyar*, 2013 IL 113655, ¶ 27). A motion to dismiss under section 2-619(a)(9) presents a question of law that is reviewed *de novo*. *Id.* (citing *Boyar*, 2013 IL 113655, ¶ 27).

¶ 15    In the present case, Archford filed a complaint against Davis, seeking (1) a declaratory judgment that the Protocol did not invalidate the terms of the Agreement entered into by Archford and Davis and (2) a judgment for money damages against Davis for breach of the Agreement. Archford relied on paragraph 3 of the Amendment, wherein Davis agreed "that Archford shall be entitled to compensation for its work and investment in clients or referral sources that may transfer to Davis within twenty-four (24) months following any termination of his employment with Archford." paragraph 3 set forth the procedures for Davis to follow and the amounts Davis would owe in the event that certain clients transferred to Davis during the specified time period following the termination of his employment with Archford. paragraph 3 additionally provided that "[t]he

compensation paid to Archford shall be deemed to be a purchase of this 'book of business' from Archford." Lastly, paragraph 3 stated that no payment was required of Davis for the transfer of clients named on two separate lists attached as exhibits to the Agreement.

¶ 16    Davis asserted before the circuit court that Archford's complaint should be dismissed pursuant to section 2-619(a)(9) because the Protocol constituted an affirmative matter that barred or defeated Archford's claims. Specifically, Davis argued that the Protocol prohibited monetary liability against Davis for taking client information and for former clients transferring to him at his new firm. Davis reiterates this argument on appeal in support of his contention that the court properly dismissed Archford's complaint. Unlike the dissent, we disagree with Davis.

¶ 17    We initially note that this case presents an issue of first impression. Davis's argument is premised on his interpretation of a single provision in the Protocol. Davis, and the dissent, rely on the following provision:

> "The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ('RRs') between firms. If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm ***."

¶ 18    Davis posits, and the dissent agrees, that this "clear and unambiguous" language of the Protocol, especially the second sentence of the paragraph above, applies and "supersedes" paragraph 3 of the Amendment, as well as the nonsolicitation and nondisclosure sections of the Agreement which are not at issue in this appeal. However, our review of the Protocol, as a whole,

13

leads to a different conclusion. See *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007) (noting that under ordinary principles of contract law, a contract must be construed as a whole, viewing each provision in light of the others, and that the intent of the parties is not to be derived from any clause or provision standing by itself).

¶ 19    Notably, the Protocol sets forth various exceptions to the general provision stated above. Specifically, the provision Davis and the dissent rely upon goes on to state: "*provided*, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for 'raiding.' " (Emphasis in original.) The Protocol also includes the following provision:

> "RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. *A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers* to move their accounts by a departing RR before he or she has left the firm." (Emphasis added.)

¶ 20    The Protocol additionally references outside agreements, including a "services agreement for stock benefits management services," "a participation agreement," and a "team/partnership agreement," and states that those agreements may govern under certain circumstances. For example, the Protocol includes the following provisions pertaining to a team/partnership agreement:

> "If an RR is a member of a team or partnership, and where the entire team/partnership does not move together to another firm, the terms of the team/partnership agreement will govern for which clients the departing team members or partners may take Client Information and which clients the departing team members or partners can solicit.

14

In no event, however, shall a team/partnership agreement be construed or enforced to preclude an RR from taking the Client Information for those clients whom he or she introduced to the team or partnership or from soliciting such clients[.]

In the absence of a team or partnership written agreement on this point, the following terms shall govern where the entire team is not moving: (1) If the departing team member or partner has been a member of the team or partnership in a producing capacity for four years or more, the departing team member or partner may take the Client Information for all clients serviced by the team or partnership and may solicit those clients to move their accounts to the new firm without fear of litigation from the RR's former firm with respect to such information and solicitations; (2) If the departing team member or partner has been a member of the team or partnership in a producing capacity for less than four years, the departing team member or partner will be free from litigation from the RR's former firm with respect to client solicitations and the Client Information only for those clients that he or she introduced to the team or partnership."

¶ 21   Based on our reading of the Protocol as a whole, we are unable to conclude that the language of the Protocol is "clear and unambiguous" and "supersedes" paragraph 3 of the Amendment. The Protocol sets forth various conditions and exceptions to the general provision that prohibits monetary liability against a registered representative (RR), such as Davis, for the taking of certain information or the solicitation of certain clients. Moreover, there is no provision in the Protocol that expressly prohibits a firm from entering into a contractual agreement with an RR that requires the RR to reimburse the firm for the transfer of certain clients to the RR following the termination of his or her employment. In fact, the Protocol recognizes that "[a] firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on

15

the solicitation of customers to move their accounts by a departing RR before he or she has left the firm." *Id.* This provision is consistent with the public policy of this State. See *Holstein v. Grossman*, 246 Ill. App. 3d 719, 726 (1993) ("Public policy itself strongly favors freedom to contract."). Consequently, we are unable to conclude, as a matter of law, that the Protocol "supersedes" paragraph 3 of the Amendment at this stage in the proceedings. We note that the dissent contends that our finding is that the Protocol does not apply to the postemployment relationship between Davis and Archford. This is not the case. Rather, the majority is unable to conclude that the Protocol is clear and unambiguous, where various conditions and exceptions exist and express language concerning liability against an RR is lacking. Based on this, the majority merely finds that more fact finding is necessary in order to resolve this issue.

¶ 22 In construing the pleadings and supporting documents in a light most favorable to Archford, it may be reasonable to infer that Davis voluntarily waived any protections the Protocol may have offered him by entering into the Agreement with Archford. Davis, a seasoned financial portfolio manager, agreed to paragraph 3 of the Amendment, which clearly required him to pay Archford specified sums for the transfer of certain clients as compensation for Archford's "book of business" in the event his employment with Archford terminated. In exchange, the Amendment allowed Davis to receive a benefit in the form of additional bonus compensation. In addition, Davis and Archford agreed on a list of clients that could transfer to Davis following the termination of his employment without triggering Davis's obligation to pay Archford compensation. In our view, questions of fact exist as to whether Davis waived protections of the Protocol by agreeing to paragraph 3 of the Amendment. The agreement lists clients brought to the firm by Davis, in which there would be no fee upon Davis leaving the firm. This language suggests that there was a

16

negotiation between Davis and Archford in the modified employment contract, wherein Davis knew exactly what he was agreeing to and did so willingly.

¶ 23    Therefore, under these circumstances, we find that the Protocol did not constitute an affirmative matter that avoids the legal effect of or defeats the claims in Archford's complaint. Instead, we conclude that it is necessary to remand the matter back to the circuit court for further fact-finding on the issues presented by the complaint. For these reasons, we conclude that the circuit court erred by granting Davis's motion to dismiss under section 2-619(a)(9).

¶ 24                                    III. CONCLUSION

¶ 25    For the foregoing reasons, we reverse the order of the circuit court of St. Clair County dismissing the complaint with prejudice and remand the cause for further proceedings consistent with this opinion.

¶ 26    Reversed and remanded.

¶ 27    JUSTICE MOORE, dissenting:

¶ 28    I respectfully dissent. The majority finds that the Protocol does not constitute an affirmative matter that defeats Archford's claims. To reach this conclusion, the majority posits that the freedom to contract allows the Amendment to the Agreement to modify the applicability of the Protocol, ultimately finding that the Protocol does not apply to the postemployment relationship between Davis and Archford.

¶ 29    Archford does not contend that the Protocol is inapplicable to the postemployment relationship between it and Davis. Rather, Archford contends that the Protocol only applies to solicitations by brokers and not the intended and next logical step following a solicitation, the actual transfer of the client. To fully address the issues raised by Archford, additional facts will be presented.

17

¶ 30                    I. ADDITIONAL BACKGROUND

¶ 31                         A. The Agreement

¶ 32    In addition to those portions of the Agreement provided by the majority, I believe the following sections are also relevant. The original employment contract also contained provisions regarding bonus compensation.

"5. Bonus Compensation: In addition to his base compensation, Davis may be eligible to receive the following bonuses as set forth in this paragraph. The bonuses are based on the retention and growth of the Fee Based Assets Under Management of Deschaine & Company, LLC on the measurement date of August 31, 2015.

A. Bonus A: If the revenue from Fee Based Assets Under Management of the Deschaine & Company, LLC, clients measured 6 months after August 31, 2015, is greater than or equal to 100% of the revenue from Fee Based Assets Under Management on the measurement date, Davis shall be entitled to a bonus of Ten Thousand Dollars ($10,000.00). This bonus will be paid quarterly in the year following the year in which it is earned and the first payment will be at the end of the first quarter of the following year after the bonus is earned.

B. Bonus B: If the revenue from Fee Based Assets Under Management of the Deschaine & Company, LLC, clients measured 12 months after August 31, 2015, is greater than or equal to 110% of the revenue from Fee Based Assets Under Management on the measurement date, Davis shall be entitled to a bonus of Fifteen Thousand Dollars ($15,000.00). This bonus will be paid quarterly in the year following the year in which it is earned and the first payment will be at the end of the first quarter of the following year after the bonus is earned.

C. Bonus C: If the revenue from Fee Based Assets Under Management of the Deschaine & Company, LLC, clients measured 24 months after August 31, 2015, is greater than or equal to 100% of the revenue from Fee Based Assets Under Management on the measurement date, Davis shall be entitled to a bonus of Ten Thousand Dollars ($10,000.00). This bonus will be paid quarterly in the year following the year in which it is earned and the first payment will be at the end of the first quarter of the following year after the bonus is earned."

¶ 33  The Agreement also contained a nonsolicitation provision.

"11. Nonsolicitation: Davis specifically acknowledges that he will have access to Confidential Information, including, without limitation, specific prospective and existing clients, customer lists, business development organizations, existing employees, and employee lists of Archford. Davis covenants and agrees that during the term of this Agreement, and for a continuous uninterrupted period of twenty-four (24) months, commencing upon the expiration or termination of employment under this Agreement, except as otherwise provided in writing by Archford, he shall not, either directly or indirectly, for himself, or through, on behalf of, or in conjunction with any person, persons, partnership, association, corporation, or entity:

(i) Solicit, attempt to solicit, accept, or initiate communications through any direct announcement, advertisement, circular, newsletter, or any other means of communication, including oral communication, any person or entity who was a client, customer, current or prospective, or source of business of Archford during the two (2) year period prior to Davis' last date of employment to any competitor by direct or indirect inducement or otherwise[.]"

¶ 34  B. Davis's Separation of Employment From Archford

¶ 35  On or about October 22, 2020, Davis's employment with Archford ended. On October 23, 2020, Davis provided a client list to Archford of client contact information that he intended to retain. The client list contained the names, addresses, home phone numbers, work phone numbers, cell phone numbers, and e-mail addresses of approximately 100 Archford clients.

¶ 36  C. Archford's First Lawsuit Against Davis

¶ 37  On November 2, 2020, Archford filed a verified complaint for declaratory judgment and injunction against Davis in St. Clair County, case No. 20-MR-273 (Archford I). Maher, CEO of Archford, signed the verification. The Archford I complaint referenced and attached the Agreement between Archford and Davis but did not reference the Amendment.

¶ 38  In the initial action, Archford was seeking to enforce the provisions of the Agreement regarding confidential information, nonsolicitation, and nondisclosure. In addition to setting forth the provisions of the Agreement it relied upon, the Archford I complaint contained the following allegations of fact:

"24. On October 22, 2020, Archford terminated Davis's employment for cause.

25. On October 23, 2020, Davis revealed that he possessed a list of Archford clients that included contact information for such clients (the 'Client List').

26. On October 23, 2020, Davis also instructed Archford as follows: '[i]f clients or anybody else seeks to contact me after my resignation, Archford is instructed to have them contact me on my cellphone as follows[.]'

27. The Client List contains Confidential Information within the meaning of the Agreement, including the names, addresses, home phone numbers, work phone numbers, cell phone numbers, and email addresses of approximately 100 Archford clients.

20

28. Of the approximately 100 persons on the Client List, only the following nine are excluded from the non-solicitation and non-disclosure requirements of the Agreement pursuant to Section 13 of the Agreement ***.

29. On October 29, 2020, Davis, through counsel, wrote to counsel for Archford claiming a right to solicit Archford clients pursuant to the Protocol for Broker Recruiting (the 'Protocol').

* * *

34. Davis has not notified Archford that he moved to a firm which is a signatory to the Protocol."

¶ 39 The Archford I complaint asserted that the Protocol does not apply unless a resigning RR moves directly from one Protocol firm to another without any intervening break in employment. Archford argued that if an RR had not already agreed to join another firm in the Protocol at the time of the RR's resignation, the Protocol would not apply.

¶ 40 On November 10, 2020, an order was issued imposing certain restrictions on Davis because he was not employed at that time with a firm that was a signatory to the Protocol. On December 11, 2020, a subsequent order was entered that vacated the order entered November 10, 2020. Following the issuance of the order on November 10, 2020, Davis became employed with a financial services firm that was also a signatory to the Protocol. In vacating its prior order, the circuit court stated "that, based upon the fact that [Davis] is employed by a firm that is a signatory to the Protocol and based upon the language of the Protocol, [Archford] has not established that it (1) has a protectable right; (2) is subject to irreparable harm; (3) is without an adequate remedy at law; or (4) has a likelihood of success on the merits as required by Illinois law."

21

¶ 41                    D. Archford's Current Lawsuit Against Davis

¶ 42    On April 7, 2021, Archford filed the underlying complaint against Davis in St. Clair County. The first count of the complaint seeks a declaratory judgment declaring that the Protocol does not render unenforceable or otherwise invalidate any of Davis's obligations pursuant the Agreement and requiring Davis to comply with any past due and future obligations under the Agreement.

¶ 43    In support thereof, the complaint alleges that Davis has continuing obligations under paragraph 3 ("Compensation to Archford for Transferred Clients") of the Amendment. According to the complaint, the Protocol limits liability arising by reason of the taking of client information or solicitation of former clients, but it does not undo contractual obligations arising by reason of the transfer of clients. As such, Archford alleges that the Protocol does not bar enforcement of paragraph 3 of the Amendment. Further, the complaint states that Archford is not attempting to prevent the taking of information or Davis's solicitation of his former clients.

¶ 44    Davis filed a motion to dismiss the complaint with prejudice pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2020)) asserting that the Protocol applied and defeated Archford's action. The parties fully briefed the issues, and a hearing was conducted by the circuit court. The circuit court took judicial notice of the pleadings and proceedings in Archford I.

¶ 45    On October 19, 2021, the circuit court entered an order granting Davis's motion to dismiss with prejudice. The circuit court found that the Protocol barred enforcement of the Agreement. Additionally, the circuit court found that Davis was entitled to recover his reasonable attorney fees and court costs from Archford. Archford filed a timely notice of appeal on November 18, 2021.

22

¶ 46                                    II. ANALYSIS

¶ 47                    A. Interpretation and Application of the Protocol

¶ 48    The ultimate issue before us is if and how the Protocol governs the postemployment relationship between Davis and Archford beyond the preliminary injunction and/or temporary restraining order stage. This is a matter of first impression in Illinois,[5] and it is important to analyze the history of the Protocol and the other cases that have examined the Protocol throughout the nation.

¶ 49    "The Protocol is a voluntary agreement entered into by registered broker/dealers which allows registered representatives of those broker/dealers to move between firms that have adopted the Protocol, and be free from litigation by the former firm to enforce any restrictive covenant in an employment agreement." *Scheffel Financial Services, Inc. v. Heil*, 2014 IL App (5th) 130600, ¶ 15. The Protocol was created in 2004 by three of the largest brokerage firms, Smith Barney (now Morgan Stanley), Merrill Lynch, and UBS. Andrew Rozo, *The Fall of the Broker Protocol*, Fordham J. of Corp. & Fin. L. (Apr. 4, 2018) https://news.law.fordham.edu/jcfl/2018/04/04/the-fall-of-the-broker-protocol/ [https://perma.cc/R8QJ-ZXWL].

¶ 50    The Protocol provides, in pertinent part, as follows:

"The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ('RRs') between firms. If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the

---

[5]The Fifth District has previously considered a matter involving the Protocol—*Scheffel Financial Services, Inc. v. Heil*, 2014 IL App (5th) 130600; however, we were considering whether the circuit court abused its discretion in granting a preliminary injunction and not the merits of the case.

23

information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for 'raiding.' The signatories to this protocol agree to implement and adhere to it in good faith.

When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ('the Client Information') and are prohibited from taking any other documents or information. Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her. The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR. The local branch management will send the information to the firm's back office. In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm will be taken by him or her.

To ensure compliance with GLB and SEC Regulation SP, the new firm will limit the use of the Client Information to the solicitation by the RR of his or her former clients and will not permit the use of the Client Information by any other RR or for any other purpose. If a former client indicates to the new firm that he/she would like the prior firm to provide account number(s) and/or account information to the new firm, the former client will be asked to sign a standardized form authorizing the release of the account number(s)

and/or account information to the new firm before any such account number(s) or account information are provided.

The prior firm will forward to the new firm the client's account number(s) and/or most recent account statement(s) or information concerning the account's current positions within one business day, if possible, but, in any event, within two business days, of its receipt of the signed authorization. This information will be transmitted electronically or by fax, and the requests will be processed by the central back office rather than the branch where the RR was employed. A client who wants to transfer his/her account need only sign an ACAT form.

RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm.

\* \* \*

A signatory to this protocol may withdraw from the protocol at any time and shall endeavor to provide 10 days' prior written notice of its withdrawal to all other signatories hereto. A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory. The protocol will remain in full force and effect with respect to those signatories who have not withdrawn." Carlile Patchen & Murphy, LLP, *Read The Broker Protocol*, The Broker Protocol, https://thebrokerprotocol.com/index.php/authors/read-the-protocol (last visited Jan. 5, 2023) [htts://perma.cc/H8B8-R7GQ].

¶ 51   The Protocol was created to reduce litigation when a broker left a firm to join another. See Paul A. Wilhelm and Stephen R. Gee, *Understanding the Trends, Tools, and Remedies: Protecting Your Financial Institution From Heists of Talent and Trade Secrets*, 59 DRI For Def., No. 1, Jan. 2017 at 39. Prior to 2004, when a broker left a firm to join another their "clients often [got] caught in the middle of what amounts to a messy divorce." Paul Sullivan, *As Big Firms Exit Broker Pact, Investors are Uneasy*, N.Y. Times, Jan. 19, 2018, https://www.nytimes.com/2018/01/19/your-money/broker-protocol.html [https://perma.cc/QB4N-XEGJ]. The pre-Protocol litigation "concerned the transfer of client information and essentially the transfer of business." Rozo, *supra*.

¶ 52   It is important to note that for the Protocol to apply to a broker's transfer, both the firm the broker is leaving and the new firm the broker is joining must be signatories to the Protocol. If only one firm was a signatory to the Protocol, any contract provision regarding the taking of client information and solicitation of clients would be applicable. At all relevant times, Archford was a signatory to the Protocol, as was the firm that hired Davis after his separation from Archford.

¶ 53   As this is a matter of first impression in Illinois, research was conducted to reveal if any other jurisdictions had persuasive authority that would be beneficial to this court. A search for cases involving the Protocol across all 50 states, and the federal courts, revealed only 40 results.[6]

---

[6]The few cases examining the Protocol are likely due to the Financial Industry Regulatory Authority's (FINRA) mandatory arbitration provisions. FINRA is a not-for-profit organization that works under the supervision of the Securities and Exchange Commission to, among other things, "write and enforce rules governing the ethical activities of all registered broker-dealer firms and registered brokers in the U.S." (Emphasis omitted.) *About FINRA*, FIRNA https://www.finra.org/about/what-we-do (last visited Jan. 5, 2023) [https://perma.cc/6ESC-KA2N].

According to FINRA rules, "[e]xcept as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among: [m]embers; [m]embers and [a]ssociated [p]ersons; or [a]ssociated [p]ersons." FINRA Code of Arbitration Procedure for Industry Disputes Rule 13200 (eff. Dec. 15, 2008), available at https://www.finra.org/rules-guidance/rulebooks/finra-rules/13200 [https://perma.cc/UPZ9-R93S]. As far as this court can determine from the record on appeal that was submitted to us, no requests and/or demands for arbitration were submitted to the circuit court in this matter.

The majority of those cases were on the issue of whether a preliminary injunction should be entered, and approximately 10 of those cases dealt with parties that either had not invoked the Protocol or both parties were not signatories to the Protocol—a prerequisite for the Protocol to apply. In the 15 cases seeking preliminary injunctions and/or temporary restraining orders to prevent departing RRs from taking client information and soliciting their former clients, when both the firm the RR was departing from and the new firm the RR joined were signatories to the Protocol, the requested relief was denied due to the application of the Protocol 10 times,[7] it was granted in 3 cases,[8] and in 1 case[9] it was initially granted and then dissolved. In all of these cases, the courts were examining the application of the Protocol in instances where there were also employment contracts. The freedom of an employer broker firm to enter into an employment contract with an RR did not negate the application of the Protocol to that postemployment relationship.

¶ 54    Having examined the history of the Protocol, I now turn to the interpretation and application of the Protocol to the postemployment relationship between Archford and Davis, as

---

[7]The requested relief was denied in the following cases: *Barney v. Burrow*, 558 F. Supp. 2d 1066 (E.D. Cal. 2008); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Reidy*, 477 F. Supp. 2d 472 (D. Conn. 2007); *UBS Financial Services Inc. v. Fiore*, No. 17-CV-993 (VAB), 2017 WL 3167321 (D. Conn. July 24, 2017); *Credit Suisse Securities (USA) LLC v. Lee*, No. 11 CIV. 08566 (RJH), 2011 WL 6153108 (S.D.N.Y. Dec. 9, 2011); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Baxter*, No. 1:09CV45DAK, 2009 WL 960773 (D. Utah Apr. 8, 2009); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brennan*, No. 1:07CV475, 2007 WL 632904 (N.D. Ohio Feb. 23, 2007); *Smith Barney, Inc. v. Darling*, No. 09-C-540, 2009 WL 1544756 (E.D. Wis. June 3, 2009); *Fidelity Brokerage Services LLC v. York*, No. EDCV 19-1929-JGB (SPX), 2019 WL 5485121 (C.D. Cal. Oct. 23, 2019); *KWB & Associates, Inc. v. Marvin*, No. ED CV 18-289-DMG (KKX), 2018 WL 5094927 (C.D. Cal. Apr. 18, 2018); *CitiGroup Global Markets, Inc. v. Wasser*, No. 08-60592-CIV-DIMITROULEAS, 2008 WL 11417650 (S.D. Fla. June 6, 2008).

[8]The requested relief was granted in the following cases: *J.P. Morgan Securities LLC v. Weiss*, No. 119CV-04163-TWP-MPB, 2019 WL 6050176 (S.D. Ind. Nov. 15, 2019); *J.P. Morgan Securities LLC v. Shields*, No. 1:18-CV-02788-SEB-MJD, 2018 WL 11456636 (S.D. Ind. Dec. 10, 2018); *A.G. Edwards & Sons, Inc. v. McCreanor*, No. 2:07-CV-570-FTM-29DNF, 2007 WL 2696570 (M.D. Fla. Sept. 11, 2007).

[9]The requested relief was initially granted and then dissolved in the following case: *Wachovia Securities, LLC v. Englehardt*, No. 08-CV-6303L, 2008 WL 2725504 (W.D.N.Y. July 11, 2008).

well as Archford's contention that the Protocol does not apply to the transfer of clients, only the solicitation.

¶ 55     In construing the Protocol, I have endeavored to "ascertain and give effect to the intention of the parties at the time the contract was formed." *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 77. The first sentence of the Protocol sets forth its intention as follows: "The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ('RRs') between firms." Archford's interpretation of the Protocol is in contradiction with the intention of the Protocol because it would restrict the interests of clients, and of Davis, by creating a monetary penalty that is not congruent with either the plain language or the goals of the Protocol.

¶ 56     Next, despite the majority's contention to the contrary, I examined the contract as a whole and evaluated if the words in the contract are clear and unambiguous. Here, the plain language of the Protocol is clear and unambiguous.

> "If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm ***." Carlile Patchen & Murphy, LLP, *supra*.

¶ 57     The majority points to various exceptions contained within the Protocol. However, those are narrow exceptions that are not applicable to the facts of this case. An enumerated specific exception should not be interpreted to invalidate the overarching intent of the contract. "A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in

28

a way that is contrary to the plain and obvious meaning of the language used." *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011).

¶ 58    The majority relies heavily on its misinterpretation of the following provision:

"RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR *before he or she has left the firm.*" (Emphasis added.) Carlile Patchen & Murphy, LLP, *supra*.

¶ 59    The plain language of this provision is clear: while the RR is still employed with a firm, that firm may still enforce any provisions in place regarding the solicitation of customers. However, as soon as that departing RR joins a new firm that is a signatory to the Protocol, those restrictions that were previously in place are no longer applicable. The Protocol governs the postemployment relationship.

¶ 60    Paragraph 3 of the Amendment is titled, "Compensation to Archford for Transferred Clients." Archford refers to paragraph 3 of the Amendment as a "transfer agreement" and a "revenue sharing obligation" in an attempt to distinguish it and exclude it from the Protocol. However, as explained above, the plain language of paragraph 3 of the Amendment would impose monetary liability on Davis, as the departing RR, after he leaves the firm. This is incongruent with the goals and the plain language of the Protocol. It would be unreasonable to interpret the Protocol as a shield to liability only when a departing RR solicits a former client but is ultimately unsuccessful in their attempts. This interpretation would render portions of the Protocol meaningless.

29

¶ 61 Moreover, applying Archford's interpretation that solicitations are protected, but not the actual transference of an account, would lead to absurd results. If a client desired to leave Archford for any reason, and without any solicitation or contact from Davis, and decided to take their business to Davis's new firm, the new firm would be punished and required to pay as much as 80% of the gross revenue to Archford simply because Davis is employed at the firm. Archford offered no explanation for how this scenario would be justified other than pointing to the contract between it and Davis.

¶ 62 As a signatory to the Protocol, Archford benefits because brokers may join Archford and bring their former clients with them without subjecting Archford to any monetary liability. However, Archford is taking the position that Davis and his new firm do not receive this same benefit from the Protocol. This argument is nonsensical and simply is not supported by the plain language, or the purpose, of the Protocol.

¶ 63 It is undisputed that both Archford and Davis's subsequent firm are both signatories to the Protocol, a prerequisite for the Protocol to apply. The plain language of the Protocol applies and supersedes paragraph 3 of the Amendment as well as the nonsolicitation and nondisclosure sections of the Agreement. If Archford no longer wishes to be bound by the Protocol, there is a procedure in place that allows it to leave.

> "A signatory to this protocol may withdraw from the protocol at any time and shall endeavor to provide 10 days' prior written notice of its withdrawal to all other signatories hereto. A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory." Carlile Patchen & Murphy, LLP, *supra*.

Archford has not availed itself of this procedure. Instead, it has remained a signatory to the Protocol and has continued to reap for itself the benefits pertaining thereto, while attempting to use paragraph 3 of the Amendment to circumvent the protections that the Protocol, by its plain language, bestows upon Davis and his new firm. No reasonable reading of the Protocol allows such a result.

¶ 64    Additionally, the Protocol is a contract entered into and between those firms that choose to join and sign it. Archford cannot, as the majority finds, unilaterally modify or amend how the Protocol applies when one of its departing RRs joins a new Protocol firm because "no contract can be modified in *ex parte* fashion by one of the contracting parties without the knowledge and consent of the remaining part[ies] to the agreement." *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 469 (2004).

¶ 65    Interpreting and applying the Protocol as set forth above does not render the Agreement and Amendment moot. If Davis had joined a new firm that was not a signatory to the Protocol, each and every provision of the Agreement and Amendment would be applicable.

¶ 66                                    B. Section 2-619(a)(9)

¶ 67    As the majority reversed on the interpretation of the Protocol, it was not necessary for them to evaluate the other issue raised by Archford. For completeness, we will briefly examine that issue.

¶ 68    Archford argued that the circuit court erred in granting the section 2-619 motion to dismiss, even if the Protocol unambiguously applied to paragraph 3 of the Amendment, because Davis failed to meet his burden of proving the affirmative matter relied on. Our review of an order granting a motion to dismiss is *de novo*. *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 352 (2008). "A motion to dismiss under section 2-619 admits the legal sufficiency of the plaintiff's

31

complaint, but asserts affirmative matter that defeats the claim." *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 12 (2005). Section 2-619 affords a means of disposing of issues of law and easily proven issues of fact. *Barber-Colman Co. v. A&K Midwest Insulation Co.*, 236 Ill. App. 3d 1065, 1072 (1992).

> "Motions to dismiss under section 2-619 involve essentially a summary judgment procedure [citation], but they differ from summary judgment motions in five important respects:
>
>> '(1) they are defensive in nature and may be interposed only by a party who is opposing a cause of action; (2) they must be filed prior to that defendant's answer; (3) they may not be used to contest the essential allegations of the complaint, but may be used only to assert affirmative matter; (4) they allow a determination of the motion on the merits even if there is a genuine issue of material fact raised by the affirmative matter *as long as the party opposing the motion has not filed a jury demand*; and (5) they need not be accompanied by supporting material if the affirmative matter appears on the face of the complaint.' *** [Citation.]" (Emphasis in original.) *Id.*

See also 4 Richard A. Michael, Illinois Practice, Civil Procedure Before Trial § 38:3 (2d ed. 2011) (the relationship of summary judgments to other dispositive motions). When ruling on a section 2-619 motion to dismiss, "a court must accept as true all well-pleaded facts, as well as any reasonable inferences that may arise from them [citation], but a court cannot accept as true mere conclusions unsupported by specific facts." *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31.

¶ 69    Archford argued that Davis did not meet his burden of proving the affirmative matter relied upon by filing an affidavit in support of the motion, and thus, the motion to dismiss should have been denied. However, if the affirmative matter is apparent on the face of a pleading, no affidavit is required. *Sierens v. Clausen*, 60 Ill. 2d 585, 588 (1975). Further, if an affidavit in support of a section 2-619 motion to dismiss should have been filed, but was not, "the absence of an affidavit may not be fatal." *Asset Acceptance, LLC v. Tyler*, 2012 IL App (1st) 093559, ¶ 24. The Code of Civil Procedure should be "construed liberally to fulfill its purpose of providing substantial justice and resolution on the merits, rather than imposing seemingly insurmountable procedural obstacles to litigation." *Doe v. Montessori School of Lake Forest*, 287 Ill. App. 3d 289, 296 (1997).

¶ 70    It is apparent on the face of the complaint that an analysis of the Protocol is necessary as Archford's complaint sought a declaration that the Protocol does not render unenforceable Davis's obligations under paragraph 3 of the Amendment. Archford also argues that Davis must establish that he complied with the Protocol. In the underlying matter, the circuit court took judicial notice of the pleadings and proceedings from the Archford I litigation. The Archford I complaint was a verified complaint signed by Maher, Archford's CEO, which contained judicial admissions. "Judicial admissions are formal admissions in the pleadings that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. *** A party's admissions contained in an original verified pleading are judicial admissions ***." *Konstant Products, Inc. v. Liberty Mutual Fire Insurance Co.*, 401 Ill. App. 3d 83, 86 (2010). Archford's relevant admissions are set forth above. *Supra* ¶ 43.

¶ 71    There are no disputed facts regarding compliance with the Protocol based upon Archford's own admissions. Davis prepared a list of clients that contained their names, addresses, home phone

33

numbers, work phone numbers, cell phone numbers, and e-mail addresses. Davis provided this list to Archford.

¶ 72    The plain language of the Protocol gives great deference to the departing RR when preparing the client list.

> "In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her."
>
> Carlile Patchen & Murphy, LLP, *supra*.

Additionally, Archford has not alleged that Davis acted in bad faith when preparing the list which would violate the spirit and language of the Protocol preventing its protections from applying to Davis. See, *e.g.*, *Morgan Stanley Smith Barney LLC v. O'Brien*, No. 3:13-CV-01598, 2013 WL 5962103, at *4 (D. Conn. Nov. 6, 2013) (court found departing RR's intentional changing of client telephone numbers in firm's database to be bad faith). The circuit court did not err in granting Davis's section 2-619 motion to dismiss with prejudice, as there are no disputed questions of material fact.

¶ 73    Finally, Archford argued that Davis should be required to comply with paragraph 3 of the Amendment, notwithstanding the existence of the Protocol, because he received additional bonus compensation as consideration for signing the Amendment. However, we are not evaluating whether the original Agreement and the subsequent Amendment are valid and enforceable contracts requiring good and valuable consideration. As Davis has filed a section 2-619 motion to dismiss by reason of other affirmative matter, we are viewing the complaint and the supporting Agreement and Amendment in the light most favorable to Archford and assuming the Agreement

34

and Amendment are valid and enforceable. Under the set of facts before us, because Davis moved from one Protocol firm to another, the Protocol supersedes paragraph 3 of the Amendment. However, if Davis was not at a Protocol firm, paragraph 3 of the Amendment would apply.

¶ 74                                  III. CONCLUSION

¶ 75    For the foregoing reasons, I would affirm the order of the circuit court of St. Clair County that dismissed the complaint with prejudice. Additionally, I would award attorney fees to Davis as the prevailing party pursuant to the Agreement. Because my colleagues in the majority have chosen to do otherwise, I respectfully dissent from their decision.

*Archford Capital Strategies, LLC v. Davis*, 2023 IL App (5th) 210377

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of St. Clair County, No. 21-MR-89; the Hon. William D. Stiehl, Judge, presiding. |
| **Attorneys for Appellant:** | Mark C. Goldenberg, Kevin P. Green, and Thomas C. Horscroft, of Goldenberg Heller & Antognoli, P.C., of Edwardsville, for appellant. |
| **Attorneys for Appellee:** | Vincent D. Reese and Jasmine Y. McCormick, of Mickes O'Toole, LLC, of St. Louis, Missouri, for appellee. |